97–CV–1212

James SERVAIS, Douglas Pierce, William R. Dobson, Roger Noll, Rita Noll, Byron Krueger, Melvin Schmitz, and Roger Swanson, Plaintiffs-Appellants,†

v.

KRAFT FOODS, INC., National Cheese Exchange, Inc., and Alpine Lace Brands, Inc., Defendants-Respondents.

97–CV–1777

William R. DOBSON, Plaintiff-Appellant,†

v.

KRAFT FOODS, INC., and National Cheese Exchange, Inc., Defendants-Respondents.

97–CV–1885

Roger NOLL, Rita Noll, Byron Krueger, Melvin† Schmitz, and Roger W. Swanson, Plaintiffs-Appellants,

v.

KRAFT FOODS, INC., National Cheese Exchange, Inc., Borden, Inc., and Alpine Lace Brands, Inc., Defendants-Respondents.

Court of Appeals

†Petition to review granted.

*No. 99–3199. Submitted on briefs February 26, 2001.—Decided June 28, 2001.*

## 2001 WI App 165

(Also reported in 631 N.W.2d 629.)

On behalf of the plaintiffs-appellants, the cause was submitted on the briefs of *Michael L. Stoker* of *Johns, Flaherty & Rice, S.C.* of La Crosse. There was oral argument by *Daniel Gustafson* of *Heins, Mills & Olson PLC* of Minneapolis, Minnesota.

On behalf of the defendants-respondents, the cause was submitted on the joint brief of *Thomas F. Ryan* and *Bruce M. Zessar* of *Sidley & Austin* of Chicago, Illinois; *Howard A. Pollack* of *Godfrey & Kahn, S. C.* of Milwaukee; *Colleen K. Nissl* of counsel for *Borden, Inc.* of Columbus, Ohio; *Tefft W. Smith, J. Robert Robertson, Jacqueline White Johnson,* and *Nathanael M. Cousins* of *Kirkland & Ellis* of Chicago, Illinois; *Ralph V. Topinka* and *Brian W. Blanchard* of *Quarles &*

*Brady* of Madison; *Theodore L. Banks* and *Seth A. Eisner* of counsel for *Kraft Foods, Inc.*; *Michael Fischer* and *G. Michael Halfenger* of *Foley & Lardner* of Milwaukee; and *Scott W. Hansen, Dean E. Mabie* and *Christopher Banaszak* of *Reinhart, Boerner, Van Deuren, Norris, Rieselbach* of Milwaukee. There was oral argument by *Tefft W. Smith.*

Before Roggensack, Deininger and Lundsten, JJ.

¶ 1. ROGGENSACK, J. The appellants' claims attack milk marketing orders that were established by a federal agency through formal rulemaking designed to implement a congressional scheme. Therefore, the orders determine lawful rates. Because the filed rate doctrine precludes suits for damages developed through attacks on such lawful rates, whether the claims for relief arise under state or federal law, we conclude that the filed rate doctrine bars the appellants' action. Additionally, because the appellants have made no showing of a method of damage calculation that would not be based on the difference between the milk orders the United States Department of Agriculture (USDA) established and what appellants contend the rates should have been, we do not address their assertion that they can calculate damages without attacking the USDA milk order pay prices. Accordingly, we affirm the judgment of the circuit court.

## BACKGROUND

¶ 2. The appellants in this action, James Servais, Douglas Pierce, William R. Dobson, Roger Noll, Rita Noll, Byron Krueger, Melvin Schmitz, and Roger Swanson (hereinafter Servais), are dairy farmers who claim to have been adversely affected by federal

regional milk orders for the areas in which they are producers of raw milk. They brought this suit under Wisconsin's antitrust law,[1] alleging that through a manipulation of prices paid on the National Cheese Exchange and elsewhere, the defendants, Kraft Foods, Inc., National Cheese Exchange, Inc., Borden, Inc. and Alpine Lace Brands, Inc. (hereinafter Kraft), were able to lower the milk orders' minimum pay prices for milk producers in their areas because the orders were calculated in part through the use of manipulated data. They contend that the lower prices affected what they were paid, both by handlers, who were subject to milk orders, and by co-ops, who were not subject to milk orders but did pay milk producers in accord with prevailing market rates that were affected by the milk orders. They seek monetary damages.

¶ 3. Kraft claims that no such manipulation occurred, but even if it did, this action for damages cannot go forward because the milk orders at issue here were established through a comprehensive federal scheme and therefore, the filed rate doctrine bars actions to recover damages based on the alleged invalidity of the rates established in those orders. As a counter to that argument, Servais claims that this is a state antitrust action, not a federal antitrust action, and therefore, the filed rate doctrine is inapplicable. Servais also claims that, because co-ops are not regulated by milk orders,[2] damages computed by reference

---

[1] Other state law claims were pled. However, they were dismissed prior to the circuit court's granting summary judgment on the appellants' antitrust claims. The dismissal of those claims has not been addressed by the appellants on appeal.

[2] 7 U.S.C.S. § 608c(5)(F) (Law Co-op. 1992 & Supp. 2001). All other citations to federal statutes are to the same edition of U.S.C.S.

to payments made by them should be available under the antitrust violations alleged. Servais cites a Ninth Circuit case, *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979 (9th Cir. 2000), which appellants contend has permitted a similar action to go forward.

¶ 4. The circuit court reviewed the arguments of the parties and dismissed Servais's claims on summary judgment, reasoning that the filed rate doctrine precludes antitrust claims for damages, whether they involve payments to farmers by a milk handler who was subject to a milk order or by a co-op that was not subject to a milk order, because both would necessarily attack the rate set by the USDA, an attack precluded by the filed rate doctrine. Servais appealed the dismissal. In their oral argument before this court, the appellants also claimed that they could calculate their damages without attacking the pay price set in milk orders. However, they did not explain how that would be accomplished, and the record in the circuit court is similarly uninformative.

## DISCUSSION

**Standard of Review.**

¶ 5. We apply the same summary judgment methodology as the circuit court. *Cemetery Servs., Inc. v. Department of Regulation & Licensing*, 221 Wis. 2d 817, 823, 586 N.W.2d 191, 194 (Ct. App. 1998). We first examine the complaint to determine whether it states a claim and then review the answer to determine whether it joins a material issue of fact or law. *Id.* If we conclude that the complaint and answer are sufficient to join issue, we examine the moving party's affidavits to determine whether they establish a *prima facie* case

for summary judgment. *Id.* If they do, we look to the opposing party's affidavits to determine whether there are any material facts in dispute that entitle the opposing party to a trial. *Id.*

¶ 6. Whether the filed rate doctrine requires dismissal of appellants' antitrust claims is a question of law, which we review *de novo. Prentice v. Title Ins. Co. of Minnesota*, 176 Wis. 2d 714, 721, 500 N.W.2d 658, 660 (1993).

## Federal Milk Marketing Orders.[3]

¶ 7. Federal milk marketing orders were designed to promote orderly market conditions for the sale and the supply of milk. 7 U.S.C. §§ 602(1), 608c(5). They are creatures of the Agricultural Marketing Agreement Act of 1937, as amended,[4] and, to some extent, the preceding Agricultural Adjustment Acts of 1933 and 1935. The immediate object of the Act was to fix minimum prices to be paid to milk producers by handlers and to establish consistent supplies for consumers. 7 U.S.C. § 602. This is accomplished through complex marketing orders.

> Each order includes provisions for a classified pricing plan, a system of minimum class prices, and a plan for payment of uniform prices to producers and

---

[3] Milk marketing orders can also be established through state milk marketing systems. *See, e.g., Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979 (9th Cir. 2000). Therefore, the federal government has not preempted the field for establishing milk orders, and cases such as *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132 (1963), which turn on whether preemption has occurred, are not helpful to our analysis.

[4] 7 U.S.C. § 601 *et seq.*

provisions for administering the order. Although an order considers the particular requirements of an individual market, it is closely coordinated among all markets.

THE FEDERAL MILK MARKETING ORDER PROGRAM, Marketing Bulletin Number 27, at 6, United States Dep't of Agriculture. While establishing a minimum pay price for milk, the Act specifically does not forbid the payment of prices above the minimum set by a milk order. *Stark v. Wickard*, 321 U.S. 288, 291 (1944).

¶ 8. The Act authorizes the Secretary of the Department of Agriculture to hold hearings when milk orders are proposed to be implemented or amended. 7 U.S.C. § 608c. The USDA is responsible for judging the merits of proposed orders based on evidence presented at a public hearing. Marketing Bulletin Number 27, at 11. The USDA's *Rules of Practice and Procedures* determine prehearing, as well as hearing, procedures. *Id.* at 12.

¶ 9. Generally, a new milk order is proposed by dairy farmers, but it may also be proposed by other persons, such as milk handlers and the Secretary of the Department of Agriculture. *Id.* When the USDA receives a proposal for a new or amended order, the rulemaking process begins. The USDA assigns one of its marketing specialists to study the proposed order. After the prehearing study has been completed and it indicates that a new or amended milk order may be warranted, a public hearing is held to receive evidence about "economic and marketing conditions that relate to the handling of milk in the marketing area for which a Federal milk order is proposed." *Id.* at 14. Subsequent to the hearing, a recommended decision is prepared by USDA marketing specialists and published in the *Federal Register*. It is also mailed to

anyone who was present at the public hearing and anyone known to be interested in the decision, such as area milk producers and milk handlers. *Id.* at 16. Before a new order or an amended order may take effect, it must receive approval from milk producers in that region, with the requisite amount of approval dependent on the type of order at issue. In a like manner, an already existing order may also be amended through formal USDA rulemaking. *Id.* at 18.

**Filed Rate Doctrine.**

### *1. Overview.*

¶ 10. The filed rate doctrine is a concept created by the United States Supreme Court in *Keogh v. Chicago & N.W. Ry. Co.*, 260 U.S. 156 (1922). *Keogh* addressed whether rates for common carriers, which may have been fixed at a higher level as the result of a conspiracy between carriers but had been approved as non-discriminatory and reasonable by the Interstate Commerce Commission, could be attacked by a private shipper under federal antitrust law. The Court explained that rates set by the commission must be stringently applied to prevent unjust discrimination, which was Congress's paramount purpose in authorizing the commission to set them. *Id.* at 163. The Court reasoned that because the filed rate was the legal rate, it could not be discriminatory. *Id.* at 164. Furthermore, the right defined by the tariff could not be varied or enlarged either by contract or by tort. *Id.* at 163.

¶ 11. The Supreme Court also reasoned that an injury implied the violation of a legal right and because the "instrument by which Keogh is alleged to have been damaged are rates approved by the Commission" he was not claiming an injury that implicated the viola-

tion of a legal right. *Id.* at 161. Stated another way, legal rights are established by the commission's set rates, which are reasonable as a matter of law. The concern about not getting underneath the commission's rates involved the justiciability of determining "reasonable rates," which the Supreme Court has continued to hold that courts must avoid as impermissible judicial rate-making. *Montana-Dakota Utilities Co. v. Northwestern Pub. Serv. Co.*, 341 U.S. 246, 251–52 (1951).

¶ 12. While we note that *Keogh* was decided when common carriers were restricted by federal legislation and that deregulation has since taken place, its dual concerns of avoiding discriminatory rates and of avoiding judicial rate-making have retained their importance in analyzing attacks on rates set by federal agencies and have caused the filed rate doctrine to be applied in many other contexts. *See, e.g., AT&T v. Central Office Tel., Inc.*, 524 U.S. 214 (1998) (holding that the filed rate doctrine applies to the Communication Act's filed-tariff requirements, precluding state law claims); *Arkansas Louisiana Gas Co. v. Hall*, 453 U.S. 571 (1981) (holding that a natural gas producer could not sue a buyer of natural gas for breach of contract damages because to do so would cause the court to impose a rate other than that established by the federal agency); *Stark v. Wickard*, 321 U.S. 288 (1944) (holding that while damages which may have resulted from a milk order which was alleged to be unfair to certain producers could not be maintained due to the filed rate doctrine, an action for injunctive relief was not prohibited).

## 2. *The Servais Claims.*

¶ 13. The parties do not dispute that the milk orders challenged in this action were established through formal USDA rulemaking, as part of the federal program outlined above. From that rulemaking process, a minimum pay price was established that is, as a matter of law, the reasonable rate and therefore the lawful minimum price for those who opted into the federal milk marketing program. *See Arkansas Louisiana Gas*, 453 U.S. at 577.

■

¶ 14. To calculate the damages Servais claims to have sustained under these antitrust claims, including those damages that Servais claims to have sustained from sales to co-ops whose pay prices were not controlled by milk orders but were affected by them, a court would have to conclude that the USDA minimum pay price is not reasonable and to speculate what price the USDA would have set for milk orders if the alleged price manipulation at the National Cheese Exchange[5] had not occurred. However, because the milk orders at issue are federally established rates, such speculation would undermine a congressional scheme of uniform rate regulation and award as damages a dollar amount based on a new milk price never established by the USDA. This cannot occur because the filed rate doc-

---

[5] Servais claims that the manipulation was not solely of the National Cheese Exchange prices. However, that assertion does not change our analysis because we cannot look underneath the minimum pay prices set in the milk orders, regardless of the acts alleged to have caused an invalid price. To do as Servais requests would necessarily involve us in determining a reasonable rate for that milk order, and this we cannot do. *Arkansas Louisiana Gas Co. v. Hall*, 453 U.S. 571, 577 (1981).

trine precludes substituting the judgment of a court for the judgment of the USDA as to what constitutes a reasonable minimum pay price, even when the claim for damages is based on state law. *Arkansas Louisiana Gas*, 453 U.S. at 579.

¶ 15. Servais contends that because *Knevelbaard Dairies*, a case brought in the federal courts of California where a milk order was attacked based on allegations similar to those presented here, has been allowed to proceed, we should conclude that the filed rate doctrine does not preclude this action for antitrust damages. We disagree. *Knevelbaard Dairies* arises from a milk order established by an agency of the State of California, not one established by a federal agency. *Knevelbaard Dairies*, 232 F.3d at 982. As the Ninth Circuit acknowledged, "This case . . . involves only a *state* antitrust law being applied where an *agency of that state* has set a commodity price that, according to the complaint, was wrongfully depressed by manufacturers who collusively manipulated data submitted to and used by the agency." *Id.* at 992 (emphasis in original). That the milk order at issue was not set by a federal agency was critical to the court's conclusion that it was not bound to apply the federal filed rate doctrine, as the emphasis it placed in its reasoning quoted above demonstrates. In contrast, the milk orders attacked here were established as part of a federal program to which we are bound to apply the federal filed rate doctrine.

¶ 16. Additionally, the Wisconsin Supreme Court has already adopted the filed rate doctrine for state claims based on Wisconsin law if the claims seek damages by attacking a rate created by a comprehensive state program. *Prentice*, 176 Wis. 2d at 725, 500 N.W.2d at 662. It also has adopted the reasoning of

*Keogh. Prentice*, 176 Wis. 2d at 725–26, 500 N.W.2d at 662–63. Therefore, Wisconsin law provides no basis for concluding that we should not apply the federal filed rate doctrine to these federally established rates. Accordingly, we conclude that the circuit court did not err when it granted summary judgment to Kraft dismissing appellants' complaint, and we affirm its judgment.

## CONCLUSION

¶ 17. Because the federal milk marketing orders at issue here were established by a federal agency through formal rulemaking designed to implement a congressional scheme, they determine lawful rates. And because the filed rate doctrine precludes suits for damages developed through attacks on such lawful rates, whether the claims for relief arise under state or federal law, we conclude that the filed rate doctrine bars the appellants' action herein. Additionally, because the appellants have made no showing of a method of damage calculation that would not be based on the difference between the milk orders the USDA established and what appellants contend they should have been, we do not address their assertion that they can calculate damages without attacking the USDA milk order pay prices. Accordingly, we affirm the judgment of the circuit court.

*By the Court.*—Judgment affirmed.