Ralph Schmidt and Karline Schmidt, Plaintiffs,

August C. Heeg, Jr., and Joanne Heeg,
Plaintiffs-Appellants,

v.

Northern States Power Company
d/b/a Xcel Energy, St. Paul Fire & Marine
Insurance Company and Associated Electric &
Gas Insurance Services Limited d/b/a Aegis
Insurance Services, Inc., and/or Aegis Security
Insurance Company, Defendants-Respondents.†

Court of Appeals

*No. 2005AP862. Submitted on briefs November 4, 2005.*
*—Decided September 28, 2006.*

2006 WI App 201

(Also reported in 724 N.W.2d 354.)

† Petition to review filed.

813

On behalf of the plaintiffs-appellants, the cause was submitted on the briefs of *Charles A. Bird* and *Andrea B. Niesen* of *Bird, Jacobsen & Stevens, Rochester, Minnesota,* and *Timothy S. Jacobson* and *James R. Koby* of *O'Flaherty Heim Egan, Ltd.*, La Crosse.

On behalf of the defendants-respondents, the cause was submitted on the brief of *Michael J. Happe* of

*Ryberg & Happe, S.C.*, Eau Claire, and *Steven F. Stanaszak* of *Whyte Hirschboeck Dudek, S.C.*, Milwaukee.

Before Lundsten, P.J., Vergeront and Deininger, JJ.

¶ 1. DEININGER, J.  Joanne and August Heeg appeal a judgment dismissing their claims against Northern States Power Company. They claim that the circuit court erred in determining on summary judgment that their claims were barred by the six-year statute of limitations, WIS. STAT. § 893.52 (2003–2004).[1] We conclude the facts of this case do not present a situation where uncontroverted evidentiary facts can lead to only one conclusion regarding whether the statute of limitations bars the plaintiffs' claims, and, thus, neither Northern States nor the Heegs can prevail on the limitations issue as a matter of law. We also conclude that the Heegs' claims are not barred by the filed rate doctrine, as Northern States contends. Accordingly, we reverse and remand for further proceedings on the Heegs' claims against Northern States.

## BACKGROUND

¶ 2.  Because this case comes to us on summary judgment, the following facts are taken from the parties' submissions on summary judgment. The relevant historical facts are largely undisputed, but the parties very much dispute the inferences that may reasonably be drawn from those facts.

¶ 3.  August and Joanne Heeg are dairy farmers. In April 1970, they purchased a farm in Marathon County and operated it until 1999. Shortly after they

---

[1] All references to the Wisconsin Statutes are to the 2003–04 version unless otherwise noted.

began operating at this location, they noticed the health of their herd begin to deteriorate. The cows developed numerous problems, which included mastitis, udder deformities, problems "milking out," bad knees, low feed consumption, poor breeding, kicking and switching tails, and, ultimately, poor milk production. The Heegs consulted various specialists, including nutritionists, veterinarians and electricians, in their efforts to resolve the problems with their herd. Among measures they took to improve their herd's health and production were wetting the feed, using Oxytocin to help cows let down their milk, using a chlorinator, and purchasing a new feed mixer and cow mats. Despite these efforts, the health of their herd did not improve.

¶ 4. The subject of stray voltage came up early in the Heegs' consultations with a number of specialists. August Heeg remembers discussing stray voltage and earth currents with some of them as a possible cause of the continuing problems with his herd as early as 1970. He remembers that his electric bill during this period was "way high." It was not until the mid-to-late 1980s, however, when their nutritionist at the time, a Mr. Hinrichsen, informed the Heegs that he believed the cause of the problem was stray voltage, that they first contacted Northern States Power Company to request stray voltage testing.

¶ 5. The first test by the utility in 1987 and the subsequent eight tests during the 1995–98 period all came back negative for stray voltage. In the early 1990s, another nutritionist, Dr. Bender, and a veterinarian, Dr. Shulte, advised the Heegs that, based on the way the cows were behaving and their poor feed intake, stray voltage was to blame. The test results produced by Northern States during discovery demonstrated continuous neutral to earth voltages as high as 1.55 volts at

818

the transformer ground and 1.2 volts at the Heegs' barn, with spikes as high as 2.34 volts at the transformer and 1.3 volts at the barn. The last test, conducted September 21, 1998, showed that the "cow trainer" (an on-farm source of stray voltage) produced 3.5 volts.

¶ 6. In addition to requesting tests from Northern States, the Heegs took other steps to remedy the suspected stray voltage problem. In the late 1980s, they hired two electrical contractors to rewire the farm, upgrade it to a four-wire system, increase the size of circuit breakers and install underground wiring. In 1997, the Heegs asked Northern States to install neutral isolation from the primary line, which the company did at the Heegs' expense. None of these measures resulted in significant improvement to the condition of the herd. In August 1999, another electrical contractor hired by the Heegs, Stetzer Electric, issued a report that identified the cause of the problem as "harmonic distortion," but the report made no mention of stray voltage. Finally, in October 1999, the Heegs transferred their herd to a different location operated by Heeg Brothers Dairy. After the move, the herd's milk production increased from fifty pounds per cow at the Heegs' farm to eighty-one to eighty-two pounds per day at the new location, and the herd cull rate decreased from 60% to 18–20%.

¶ 7. Based on these significant improvements in herd health and production at the new location, the Heegs obtained independent electrical testing on their farm. Schmidt Electric tested the farm on August 8, 2001 and reported the presence of stray voltage and ground currents. William Schmidt traced the source of the problem to Northern States' distribution system neutral. Specifically, he found that the amount of stray

819

current varied widely because "[w]hen a single phase customer uses power, a voltage drop occurs along the length of this neutral wire," causing "the voltage from this neutral to the earth, to rise at the farm end." He recorded up to 641 mVrms that continued for 3.6 seconds and he expressed confidence that much higher levels of stray voltage were occurring on the farm than he was able to detect during the limited testing period. Schmidt also confirmed the finding made by Stetzer that harmonic distortion was present on the farm. Schmidt, however, identified the cause of the Heegs' herd problems as stray voltage, stating that "[t]here is no question that stray voltage of the magnitude recorded on this farm would cause havoc in a dairy herd." He added that, in his experience, "the amount of harmonic content would add to the distress incurred by the cows." Finally, he criticized the isolator installed at the farm by Northern States in 1997 as being defective in design.

¶ 8. Based on the Schmidt Electric findings, the Heegs filed this action in November 2001.[2] The com-

---

[2] The case is captioned *Ralph and Karline Schmidt and August C. Heeg, Jr., and Joanne Heeg v. Northern States Power Company* and two insurers. The Schmidts and the Heegs owned separate dairy farms about thirty miles apart. They jointly commenced this action against Northern States Power Company, the utility that supplied electricity to both farms, and its insurers. The plaintiffs justified the joint action by asserting that their herds exhibited similar symptoms that they attributed to the same phenomenon, stray voltage caused by the utility. They also noted that the same expert had assessed the resulting economic damages each couple had suffered. Northern States opposed the joinder, arguing that stray voltage can be caused by a variety of on- and off-farm sources and a separate causation determination must be made with respect to each farm. The circuit court agreed with the utility and ordered the

plaint asserts several claims, including negligence, strict liability, nuisance, and violations of Wis. Stat. chs. 196 and 197 and Wis. Admin. Code ch. PSC 114. Northern States denied all allegations in the Heegs' complaint and pled several affirmative defenses. The company also moved for summary judgment, citing the statute of limitations and the filed rate doctrine as allegedly barring the Heegs' claims. The circuit court concluded, based on the summary judgment submissions, that the Heegs "should have known of their claim" against Northern States more than six years before filing their action, and that they had not exercised reasonable diligence to discover the cause of their injuries. The court thus agreed that the Heegs' action was time barred under Wis. Stat. § 893.52 and it granted Northern States' motion for summary judgment.

¶ 9. The Heegs moved for reconsideration on the basis of our newly issued opinion in *Allen v. Wisconsin Pub. Serv. Corp.*, 2005 WI App 40, 279 Wis. 2d 488, 694 N.W.2d 420, where we addressed the discovery rule as applied to a stray voltage claim. They also asserted that Northern States had committed a continuing tort and/or a continuing nuisance, and that the company had made certain misrepresentations that caused them to delay filing suit. In response, the circuit court let stand its prior ruling that the Heegs' claims were barred by the statute of limitations and concluded further that, even if the statute of limitations did not

plaintiffs to file separate complaints. The Schmidts' action was also subsequently dismissed on statute of limitations grounds, and they have also appealed. We dispose of the Schmidts' appeal in *Schmidt v. Northern States Power Co.*, No. 2005AP1677, unpublished slip op. (WI App Sept. 28, 2006). Finally, we note that we refer in this opinion to the utility and its insurers, collectively, as Northern States.

bar the Heegs' claims, they were nonetheless precluded by the filed rate doctrine as discussed in *Servais v. Kraft Foods, Inc.*, 2001 WI App 165, 246 Wis. 2d 920, 631 N.W.2d 629. The Heegs appeal the judgment dismissing their action.

## ANALYSIS

### *Statute of Limitations*

¶ 10.　The Heegs claim the circuit court erred by concluding, on the basis of the summary judgment submissions, that they knew or, through the exercise of reasonable diligence, should have known of their stray voltage claim against Northern States Power Company more than six years before they brought this action. We review an order granting summary judgment de novo, applying the same standards as the trial court. *See Voss v. City of Middleton*, 162 Wis. 2d 737, 748, 470 N.W.2d 625 (1991). Summary judgment is proper when the pleadings and evidentiary submissions show no genuine issues of material fact and one party is entitled to judgment as a matter of law. *See Maynard v. Port Publ'ns, Inc.*, 98 Wis. 2d 555, 558, 297 N.W.2d 500 (1980).

¶ 11.　The Heegs seem to argue in their opening brief that we should conclude, as a matter of law, that their claims are not barred under WIS. STAT. § 893.52. We would do so if we were to conclude that, on the record before us, no dispute of material fact exists and that the Heegs, although not the moving party, are entitled to prevail on the statute of limitations issue as a matter of law. *See* WIS. STAT. § 802.08(6). We will also

set aside an order granting summary judgment, however, if we conclude that material facts, or the competing reasonable inferences from those facts, preclude a determination of the issue on summary judgment. *See Grams v. Boss*, 97 Wis. 2d 332, 338–39, 294 N.W.2d 473 (1980) ("If the material presented on the motion is subject to conflicting interpretations or reasonable people might differ as to its significance, it would be improper to grant summary judgment.").

¶ 12.   Stated differently, we must reverse a summary judgment order and remand for further proceedings when we conclude that the record does not permit a determination in favor of either party as a matter of law and the issue in question is one that only a fact finder can resolve. *See Ford Farms, Ltd. v. Wisconsin Elec. Power Co.*, 145 Wis. 2d 650, 659, 430 N.W.2d 94 (Ct. App. 1988). We conclude that is the case on the record before us.

¶ 13.   WISCONSIN STAT. § 893.52 imposes a six-year time limitation for commencing tort actions like this one, which seek damages for injuries to personal property.[3] *See Allen*, 279 Wis. 2d 488, ¶ 8. As with other tort claims, we must apply the "discovery rule" in order to determine when the limitation period began to run on the Heegs' stray voltage claims against Northern States. *See id.*

_____

[3] WISCONSIN STAT. § 893.52 provides as follows:  "An action, not arising on contract, to recover damages for an injury to real or personal property shall be commenced within 6 years after the cause of action accrues or be barred, except in the case where a different period is expressly prescribed."

> Under [the discovery] rule, a plaintiff's claim accrues when the plaintiff objectively knows, or with reasonable exercise of care should have known, the cause of the injury and the defendant's part in that cause. Furthermore, "[a] plaintiff can rely on the discovery rule only if he or she has exercised reasonable diligence." Reasonable diligence means "such diligence as the great majority of persons would use in the same or similar circumstances" to discover the cause of the injury.

*Id*. (citations omitted).

¶ 14. "[D]iscovery does not occur until there is information available to the claimant of the nature of [the] injury, the cause of [the] injury, and the defendant's part in that cause." *Borello v. United States Oil Co.*, 130 Wis. 2d 397, 414, 388 N.W.2d 140 (1986). As we explained in *Allen*, 279 Wis. 2d 488, ¶ 16, under the supreme court's analysis in *Kolpin v. Pioneer Power & Light Co., Inc.*, 162 Wis. 2d 1, 26–27, 469 N.W.2d 595 (1991), the statute of limitations begins to run on a stray voltage claim when the plaintiff farmer knows or should have known both that stray voltage is present on the farm and that its cause is attributable to the defendant utility.

¶ 15. The question of when discovery occurred, that is, determining the point at which a plaintiff knew or should have known of the existence of a claim against the defendant, will sometimes present a question of law, and on other occasions, one of fact. The supreme court noted in *Kolpin* that, when a dispute concerns the construction and application of a statute of limitations, a question of law is presented, which a reviewing court may decide de novo. *See id*. at 18.[4]

---

[4] The court concluded in *Kolpin v. Pioneer Power & Light Co., Inc.*, 162 Wis. 2d 1, 469 N.W.2d 595 (1991), that "the jury's

¶ 16. In many cases, however, the record on summary judgment will not be sufficient to determine as a matter of law the point at which the plaintiff discovered or reasonably should have discovered the existence of a claim against the defendant. That is what we concluded to be true in *Ford Farms*. We noted there that all doubts regarding whether a factual issue exists must be resolved against the party moving for summary judgment, which in that case, as here, was the defendant utility. *Ford Farms*, 145 Wis. 2d at 655. We specifically pointed out that, if the summary judgment submissions "allow for different interpretations or reasonable persons might disagree as to their significance, it is improper to grant summary judgment." *Id.* (citing *Grams v. Boss*, 97 Wis. 2d at 339).

¶ 17. Because the facts relevant to the discovery issue in *Ford* were not "uncontroverted," we concluded that a "significant jury question may be presented . . . as to when Ford Farms knew or should have known the nature and cause of its alleged injury." *Id.* at 659. Accordingly, we reversed the circuit court's summary judgment dismissing the plaintiff's claims and remanded for further proceedings on those claims. *Id.* We reach the same conclusion and result on the record before us now.[5]

answer to the discovery question should be changed as a matter of law," *id.* at 25, because, on the evidence produced at trial, "the jury's answer . . . could have only been" that discovery of the plaintiffs' claim occurred within six years of their filing suit, *id.* at 27. *See also Allen v. Wisconsin Pub. Serv. Corp.*, 2005 WI App 40, ¶ 16, 279 Wis. 2d 488, 694 N.W.2d 420 (concluding, "as a matter of law, on the undisputed facts of this case . . . ," that the plaintiff "exercised reasonable diligence to investigate the source of his herd's problems," and, thus, discovery of the claim did not occur until within six years of the filing of the action).

[5] Recently, we have again acknowledged that determining when a plaintiff discovered the nature and source of an injury

¶ 18.   The facts in this case appear to fit what has come to be a somewhat familiar pattern in stray voltage cases. A dairy herd experiences health problems and declining milk production. The owner of the cows seeks to reverse the declining health and production of the herd by consulting various specialists, such as veterinarians and dairy animal nutritionists, in order to determine the cause of the problems. The farmer then alters herd management techniques and feed regimens but sees no significant or lasting improvement in herd health or production. One or more specialists at some point opine that stray voltage could be to blame. The farmer then consults electricians and the utility company to have tests performed, often with conflicting results as to whether a stray voltage problem exists, and if so, its source. At some point, a change to the herd's environment results in significant and sustained health and production improvements, such that the nature and source of the alleged injury to the cows becomes evident —stray voltage emanating from the utility's distribution system.

¶ 19.   The foregoing fact pattern was present in *Kolpin*, 162 Wis. 2d at 11–15, where the supreme court summarized the factual record as follows:

> This case does not involve the typical tort claim, *e.g.*, an automobile accident case, where the cause and

and whether he or she exercised reasonable diligence in so doing are often questions appropriately delegated to a fact finder. Specifically, relying on an alternative analysis in *Allen*, 279 Wis. 2d 488, ¶ 17, we affirmed a jury verdict that we concluded had necessarily included a determination by jurors that the plaintiff farmers had exercised reasonable diligence in attempting to discover the nature and source of the problems they experienced with their herd. *See Gumz v. Northern States Power Co.*, 2006 WI App 165, ¶¶ 12–13, 295 Wis. 2d 600, 721 N.W.2d 515.

effect of a plaintiff's injuries are readily apparent. Because of the difficulties in pinpointing the exact source of stray voltage, it is difficult for a plaintiff to determine the relationship between the stray voltage and its source. The source could be the plaintiff's own electrical wiring, a defect in the milking parlor, or an improperly grounded line leading to the barn. But in this case, once the Kolpins found the solution to their problem, they were able to trace it to the cause of their problem—Pioneer's distribution system. The "discovery" was more of a process of elimination of possible causes rather than a process of determination of the cause.

*Id.* at 26–27 (citation omitted). We quoted the foregoing summary in *Allen*, and, after also noting that the defendant utility "went to the farm three times and told Allen there was no problem," we concluded, as a matter of law, that the plaintiff had exercised reasonable diligence and only "objectively discovered the relationship between the stray voltage" on the farm and the utility, after having gone through "a reasonable process of eliminating other possible causes." *Allen*, 279 Wis. 2d 488, ¶¶ 15–16.

¶ 20. In the present case, the Heegs maintain that they did not discover that they had a claim against Northern States until (1) they transferred their herd to a different location, where their cows' health and milk production dramatically improved, and (2) testing by an electrician not affiliated with Northern States confirmed that stray voltage was present on the farm and was caused by Northern States. Northern States' response is similar to that of the defendant utilities in *Kolpin* and *Allen*: it claims that the Heegs did not exercise reasonable diligence in attempting to discover the nature and source of their injury and that they should have known of their claim against the utility long before they claim to have discovered it.

827

¶ 21. We conclude that, on the summary judgment record before us, neither party may prevail on the discovery issue as a matter of law. That is, we conclude that more than one reasonable inference can be drawn as to whether the Heegs exercised reasonable diligence in attempting to discover the nature and source of their injury and regarding whether they should have discovered their claim against Northern States prior to November of 1995. Even if it is reasonable to infer that they knew or should have known prior to 1995 that stray voltage was present on their farm, that does not necessarily mean that they also should have known that Northern States was the cause of the problem.[6] This is especially so given that Northern States maintained, as did the utilities in *Kolpin* and *Allen*, that its testing at the Heeg farm either showed no stray voltage problem or that any such problem was attributable to on-farm causes.

¶ 22. Because we must resolve all doubts regarding the reasonable inferences to be drawn from the parties' evidentiary submissions on summary judgment against Northern States, *see Ford Farms*, 145 Wis. 2d at

[6] As the supreme court explained in *Kolpin*, 162 Wis. 2d at 10, "[Stray voltage] is a natural phenomenon and is present on all active distribution systems. It can come from a variety of different sources, both on and off the farm." Later in its opinion, the court noted that the source of stray voltage "could be the plaintiff's own electrical wiring, a defect in the milking parlor, or an improperly grounded line leading to the barn." *Id.* at 27.

As for whether a party has exercised reasonable diligence in discovering the existence of an actionable claim, the question is typically one of fact. *See Spitler v. Dean*, 148 Wis. 2d 630, 638, 436 N.W.2d 308 (1989). "[R]easonable diligence . . . means such diligence as the great majority of persons would use in the same or similar circumstances." *Id.*

655, and because the factual determinations "regarding discovery are not uncontroverted," *see id.* at 659, we reverse the circuit court's grant of summary judgment and remand for further proceedings in that court. Moreover, because we reverse on the basis of the discovery rule, we do not address two other theories the Heegs advance for reversal, continuing nuisance and the continuum of negligent acts doctrine. *See id* at 659–60.

### The Filed Rate Doctrine

¶ 23.   Northern States maintains that, even if the circuit court erred in granting summary judgment on the discovery/statute of limitations issue, the court correctly concluded on reconsideration that the utility is shielded from liability to the Heegs on the present facts by the "filed rate doctrine." As we explained in *Servais*, 246 Wis. 2d 920, the Wisconsin Supreme Court has "adopted" the filed rate doctrine, which developed in the federal courts as a means of addressing the "dual concerns of avoiding discriminatory rates and of avoiding judicial rate-making." *Id.*, ¶¶ 12, 16. The doctrine, as recognized in Wisconsin, precludes a private cause of action against another for engaging in discriminatory pricing when the prices or rates in question have been established or approved by a state or federal regulatory body. *See id.*, ¶¶ 14, 16.

¶ 24.   Northern States claims that the doctrine applies in this case because, as part of its "tariff" filed with the Wisconsin Public Service Commission (PSC), it has set forth the criteria and rules under which it will perform on-farm testing for stray voltage and undertake corrective action if necessary. According to North-

ern States, the existence of this "stray voltage tariff" immunizes it from private damage claims for stray voltages or currents that fall below the PSC's "level of concern," as incorporated in the tariff.[7] Specifically, the utility contends that the Heegs are seeking "a judicial remedy that provides them with a higher level of service than authorized" in its tariff because the Heegs cannot show that Northern States caused currents above the identified "level of concern" at cow contact points on the Heeg farm "at any given time utilizing the testing procedure in [its] tariff."

¶ 25.    The supreme court held in *Hoffmann v. Wisconsin Elec. Power Co.*, 2003 WI 64, 262 Wis. 2d 264, 664 N.W.2d 55, that the absence of current measured to be above the PSC-established "level of concern" does *not* preclude a farmer from recovering damages from a utility for stray voltage injuries attributable to the utility. *Id.*, ¶ 14. Northern States would have us distinguish *Hoffmann* because, unlike the utility in *Hoffmann*, it claims that it

> does not maintain that the PSC[] standards or the PSC[] level of concern has the force and effect of law such that N[orthern States] is not liable if it complied with the PSC[] standards. Rather, it is the fact that the level of concern is incorporated in N[orthern States]' tariff that bars the Heegs from recovery in this case.

¶ 26.    We reject the attempted distinction. Rather, we conclude that the fact that Northern States has filed

---

[7] " '[L]evel of concern' has been defined by the PSC [Public Service Commission] as the level above which corrective or mitigative action should be taken if production or behavioral problems exist, which is one milliampere in the 'cow contact' areas." *Hoffmann v. Wisconsin Elec. Power Co.*, 2003 WI 64, ¶ 5, 262 Wis. 2d 264, 664 N.W.2d 55.

a tariff that includes provisions describing its policies and procedures for responding to customer complaints regarding stray voltage does not allow the utility to circumvent the *Hoffmann* holding. That is, notwithstanding its stray voltage tariff, and despite a lack of proof that cow contact currents on the Heegs' farm exceeded the PSC's designated "level of concern," Northern States is not immunized from all liability for stray voltage injury it may have caused the Heegs.

¶ 27.  The filed rate doctrine applies when a plaintiff seeks money damages based on allegedly discriminatory industry practices that cause there to be a difference between an allegedly "fair" price or rate and that established or approved by a regulatory agency. For example, *Servais* involved a suit by sellers of milk who claimed that the price of milk set under the U.S. Department of Agriculture's regional "milk orders" was too low because of the manipulative purchasing practices of several major milk buyers. *Servais*, 246 Wis. 2d 920, ¶ 2. Similarly, the claim in *Prentice v. Title Ins. Co. of Minnesota*, 176 Wis. 2d 714, 500 N.W.2d 658 (1993), was that certain title insurers were fixing prices by participating in a statewide "rate service organization." *Id.* at 719. The supreme court explained in *Prentice* that the legislative scheme for regulating insurance rates and the availability of a "regulatory remedy bars a *private rate-related suit* for damages." *Id.* at 726–27 (emphasis added). The present litigation, however, involves a property-damage claim sounding in tort; it is not a "rate-related suit for damages."

¶ 28.  Northern States also argues that "[i]t is well established that a limitation of liability contained in a tariff is an essential part of the rate at which service is furnished." That may well be true, but nothing in

831

Northern States' tariff dealing with stray voltage even so much as suggests a "limitation of liability" in return for the utility's compliance with the tariff provisions. Moreover, we question whether, if Northern States had attempted to include exculpatory language in its stray voltage tariff, such a provision would have met with the PSC's approval. The supreme court has described the applicable utility regulatory statutes and their legislative history as follows:

> Nowhere in the language of chapter 196 of the Wisconsin Statutes is common-law negligence, with respect to stray voltage, changed or altered. In fact, such a change has been specifically considered and was rejected. In Wisconsin's initial budget bill for 2001–2002, a provision was included that would have changed the standards for civil liability with respect to stray voltage. The bill proposed creating a statute, providing that "[a] public utility is immune from liability for any damage caused by or resulting from stray voltage contributed by the public utility if that stray voltage is below the level of concern established by the public service commission . . . ." 2001 S.B. 55, § 3866. However, after severe public criticism, the provision was withdrawn and was never passed into law.

*Hoffmann*, 262 Wis. 2d 264, ¶ 13.

¶ 29.  In sum, we are simply not persuaded that the filed rate doctrine alters the conclusions the supreme court reached in *Hoffmann*. We thus conclude that the filed rate doctrine does not bar the Heegs' claims against Northern States for damages resulting from stray voltage attributable to the utility.

## CONCLUSION

¶ 30.  The evidentiary submissions on summary judgment permit differing reasonable inferences regarding whether the Heegs exercised reasonable dili-

gence in attempting to ascertain the nature and source of their injury and regarding when they reasonably should have discovered their claim against Northern States Power Company. Their action seeking remedies in tort against Northern States is thus not barred as a matter of law by WIS. STAT. § 893.52, and neither is it barred by the filed rate doctrine. Accordingly, we reverse the appealed judgment and remand the Heegs' claims to the circuit court for further proceedings consistent with this opinion.

*By the Court.*—Judgment reversed and cause remanded.