Ralph SCHMIDT and Karline Schmidt,
Plaintiffs-Appellants,

August C. HEEG, Jr. and Joanne Heeg,
Plaintiffs,

v.

NORTHERN STATES POWER COMPANY
d/b/a Xcel Energy,
Defendant-Respondent-Petitioner,

ST. PAUL FIRE & MARINE INSURANCE COMPANY,
Associated Electric & Gas Insurance Services
Limited d/b/a Aegis Insurance Services, Inc.,
and/or Aegis Security Insurance Company,
Defendants-Respondents.

Supreme Court

*No. 2005AP1677. Oral argument September 11, 2007.
—Decided December 6, 2007.*

2007 WI 136

(Also reported in 742 N.W.2d 294.)

542

For the defendant-respondent-petitioner there were briefs by *Michael J. Happe, J. Drew Ryberg*, and *Ryberg & Happe, S.C.*, Eau Claire, *John D. Wilson, Jordan J. Hemaidan*, and *Michael Best & Friedrich LLP*, Madison, and oral argument *Jordan J. Hemaidan*.

For the plaintiffs-appellants there was a brief by *Charles A. Bird, Andrea B. Niesen*, and *Bird, Jacobsen & Stevens, P.C.*, Rochester, MN, and *James R. Koby* and *O'Flaherty Heim Egan, Ltd.*, La Crosse, and oral argument by *Andrea B. Niesen and Charles A. Bird*.

An amicus curiae brief was filed by *Trevor J. Will, G. Michael Halfenger*, and *Foley & Lardner LLP*, Milwaukee, and *Mark S. Henkel* and *First Law Group S.C.*, Stevens Point on behalf of Wisconsin Public Service Corporation and Wisconsin Power and Light Company.

An amicus curiae brief was filed by *O. Thomas Armstrong, William P. Croke*, and *von Briesen & Roper, S.C.*, Milwaukee on behalf of Wisconsin Electric Power Company.

An amicus curiae brief was filed by *H. Dale Peterson, John J. Laubmeier*, and *Stroud, Willink & Howard, LLC*, Madison on behalf of Wisconsin Farm Bureau Federation, Cooperative.

¶ 1. ANNETTE KINGSLAND ZIEGLER, J. This is a review of an unpublished decision of the court of appeals,[1] which reversed and remanded the decision of the Clark County Circuit Court, Jon M. Counsell, Judge. The circuit court determined on summary judgment that the six-year statute of limitations barred Ralph and Karline Schmidt's (Schmidts) claims. *See* Wis. Stat. § 893.52 (2003–04).[2] The circuit court also concluded at summary judgment that the Schmidts' claims were barred by the filed rate doctrine.[3] The court of appeals reversed and remanded, and Northern States

---

[1] *Schmidt v. Northern States Power Co.*, No. 2005AP1677, unpublished slip op. (Wis. Ct. App. Sept. 28, 2006).

[2] All references to the Wisconsin Statutes are to the 2003–04 version unless otherwise noted. Section 893.52 reads:

> An action, not arising on contract, to recover damages for an injury to real or personal property shall be commenced within 6 years after the cause of action accrues or be barred, except in the case where a different period is expressly prescribed.

[3] The filed rate doctrine is also known as the filed tariff doctrine. *Metro E. Ctr. for Conditioning & Health v. Qwest Commc'ns Int'l, Inc.*, 294 F.3d 924, 927 (7th Cir. 2002). "[It] prohibits a plaintiff from claiming a lower rate than the one filed by a regulated entity with the appropriate regulatory agency because the filed rate alone governs the relationship between the parties." *Prentice v. Title Ins. Co. of Minn.*, 176 Wis. 2d 714, 721, 500 N.W.2d 658 (1993).

Power Company d/b/a Xcel Energy (Northern States), petitioned this court for review. We affirm the court of appeals' decision.

¶ 2. The Schmidts filed action in 2001 against Northern States alleging that "stray voltage" attributable to Northern States caused damage to the health and productivity of their dairy herd.[4]

¶ 3. This appeal presents the following two issues: First, we must decide whether the summary judgment record compels us to conclude as a matter of law that the statute of limitations bars the plaintiffs' claims. Northern States asserts that the Schmidts' claims are time barred because the summary judgment record shows they "discovered" their injury and its cause in 1993 but did not bring their claim until November 13, 2001, which is over six years later. The Schmidts assert that, while the record reflects that they suspected early on that stray voltage was negatively affecting their cows, they did not have an objective belief that stray voltage from Northern States was the cause of their injury until much later. We hold that where the undisputed facts lead to more than one reasonable inference about when discovery occurred,

---

[4] The Public Service Commission of Wisconsin (PSC), investigated and implemented standards regarding "stray voltage and its effect on livestock" in 1989 and updated its findings in 1990 and 1996. It concluded:

> 'Stray' voltage is a special case of voltage in which the neutral to earth voltage is present across points (generally grounded metal objects) in which a current flow is produced when an animal comes into contact with them. . . . [T]hese contact points can include any two conductive points which the animal may simultaneously contact to complete a circuit which allows current to flow.

PSC Docket 05–EI-106, at 5 (Amended Order).

summary judgment is not proper. Here, more than one reasonable inference about when discovery occurred may be drawn from the undisputed facts in the summary judgment record.[5] Therefore, summary judgment is not appropriate.

¶ 4. Second, we must decide whether the filed rate doctrine precludes the plaintiffs' common-law tort claims as a matter of law. Northern States asserts that its filed tariff "gives rise to an affirmative obligation of [Northern States], if—and only if—the stray voltage exceeds" one milliampere in the "cow contact" area due to off-farm sources. Northern States, therefore, concludes that if no evidence shows a measurement greater than one milliampere, it cannot be liable because it would be a violation of the filed rate doctrine for Northern States to act when it does not have an obligation to act under its tariff. The Schmidts claim that the "stray voltage tariff" states nothing about damages for stray voltage and does not provide a limitation of liability for stray voltage. Rather, the Schmidts argue that the tariff addresses the circumstances under which a consumer may ask Northern States to test for stray voltage and when Northern States is obligated to provide a reduction of stray voltage. We hold that the filed rate doctrine does not bar

---

[5] *Gumz v. Northern States Power Co.,* 2007 WI 135, 305 Wis. 2d 263, 742 N.W.2d 271, is also released today. Both cases consider the application of the discovery rule in the context of stray voltage, but these cases consider different aspects of the discovery rule. *Gumz* is primarily concerned with whether, as a matter of law, the plaintiffs were reasonably diligent in attempting to discover their injury and its cause whereas this case is primarily concerned with when, as a matter of law, the Schmidts actually discovered their injury and its cause.

the plaintiffs' claims because (1) the Schmidts do not seek a "privilege" within the meaning of the filed rate doctrine and (2) as stated in *Hoffmann*,[6] conformance with the Public Service Commission of Wisconsin's (PSC) findings does not abolish Northern States' common-law duty of ordinary care.

## I

¶ 5. In 1978, the Schmidts purchased a dairy farm in Clark County, Wisconsin. They began experiencing problems with their dairy herd soon after they purchased the farm. Their cows, including new cows brought to the farm, developed problems such as mastitis, udder deformities, knee ailments, breeding difficulties, low appetite, low milk production, and unusually high mortality. These problems continued to varying degrees through 2001 when they filed their claim against Northern States.

¶ 6. In the fall of 1992, the Schmidts were experiencing problems with their herd and "reaching for reasons." According to Mrs. Schmidt, "somebody suggested that we should call the power company for stray voltage, so we called the power company . . . ." On November 24, 1992, a representative from Northern States came to the Schmidts' farm to "attempt to detect and correct neutral-to-earth or stray voltage concerns."[7] Northern States took voltage readings, but it did not find off-farm sources causing more than one milliam-

---

[6] *Hoffmann v. Wisconsin Elec. Power Co.*, 2003 WI 64, 262 Wis. 2d 264, 664 N.W.2d 55.

[7] The record contains a permission form, entitled "Agreement to Perform a Neutral-to-Earth Voltage Investigation." The form is signed by Ralph Schmidt and dated 11/24/92.

pere, the "level of concern" set by the PSC[8] in the "cow contact"[9] area. Accordingly, Northern States told the Schmidts that they did not have a problem with stray voltage, and they "would never have this problem because [the Schmidts] have plastic water lines." Northern States concluded, "no corrective action [was] needed."

¶ 7. In the spring of 1993, the Schmidts again contacted Northern States because they "had a miserable winter." The Schmidts told Northern States there has "to be something wrong." During the winter, a number of cows died, acquired mastitis, and exhibited troubling behavior, such as stomping, slopping at drinking cups, and not eating or drinking. Nothing in the record indicates Northern States returned to the farm to conduct more stray voltage analysis in response to this call. During this time, the Schmidts also called their veterinarian to treat their cows. Although the record does not give an exact date, the Schmidts re-

-------

[8] "The 'level of concern' above which corrective or mitigative action should be taken if production or behavioral problems exist is one milliampere steady state in the 'cow contact' areas." PSC Docket 05–EI-106, at 4 (Supplemental Findings). In PSC Docket 05–EI-115, the PSC clarified the "level of concern" by concluding that both the farmer and the utility share equal responsibility for stray voltage. Therefore, the level of concern is two milliampere: the farmer is responsible for half, and the utility is responsible for keeping its contribution of stray voltage to one milliampere or less. PSC Docket 05–EI-115, at 10–11.

[9] "The most important measurement areas are 'cow contact' areas where the animal can simultaneously access two points of different voltage of sufficient magnitude to cause an objectionable current to flow through the animal. These 'cow contact' points or areas primarily include the milking, feed and watering areas." PSC Docket 05–EI-106, at 8 (Amended Order).

placed their electric water tanks with plastic tanks sometime in 1993, and at some point, the Schmidts attached rubber tires to their feed bunks.

¶ 8. Also in the spring of 1993, a representative from Dairy Services checked the Schmidts' milking system. After using a "meter of some sort," he told the Schmidts, "you've got some current problems here" and "[y]ou should have somebody check this out." The Dairy Services representative suggested that the Schmidts contact Northern States and Brian Van Ert (Van Ert), an electrician.[10]

¶ 9. Later in the spring of 1993, the Schmidts hired Van Ert to rewire the "whole farm and upgrade[] all the wiring" of their on-farm or internal system. The Schmidts also asked Van Ert to assess whether they had problems with stray voltage. Van Ert concluded that the Schmidts had a problem with stray voltage, and he thought the problem was from Northern States. Van Ert called Northern States and told them he "did not think the transformer was large enough" and that "problems started when neutral fell to [the] ground in Sept. of 1992."

---

[10] The summary judgment record does not provide a clear explanation of Van Ert's qualifications. It contains no resume, previous work experience, and does not definitively state that he is a master electrician. The only mention of his qualifications arises out of the deposition questioning of Mrs. Schmidt who answered "yes" as to whether Van Ert was a master electrician. This is unlike master electrician Schmidt; the record contains significant information regarding his qualifications. It includes a detailed resume, work experience, and a comprehensive report establishing his findings regarding the Schmidts' farm. *See* ¶ 20 for a discussion of the facts pertaining to master electrician Schmidt.

¶ 10. On July 1 and July 22, 1993, Northern States returned to the Schmidts' farm to do stray voltage analysis. However, neither test showed that off-farm sources caused voltage measurements to exceed the "level of concern" in the "cow contact" area.

¶ 11. In an August 26, 1993, letter to the Schmidts from Northern States, Northern States informed the Schmidts that it would be doing "some more grounding work on the lines west" of the Schmidts on County Highway C, and it stated that Northern States planned to do some deep grounding near the Schmidts the week of August 30, 1993. The letter also stated, "[Northern States] would like to get together after this is completed and set up another recording session at your farm to determine if the effort has had any positive effects." The letter also indicated that Mr. Schmidt had asked to see some of the previous test results, but he was told by Northern States to make this request in writing.

¶ 12. On August 30, 1993, the Schmidts wrote a letter to Northern States and requested the "test results from the monitor set up in the barn." Specifically, the Schmidts requested voltage-testing results from November 24, 1992, July 1, 1993, and July 22, 1993.

¶ 13. Sometime between the August 30, 1993, letter and September 15, 1993, Mr. Schmidt called the Northern States district manager in Abbotsford, Wisconsin. According to Mr. Schmidt, "I told him I wanted to be released" from Northern States' electrical services.[11] Mr. Schmidt told Northern States he wanted something done; "I've got the test results. I'm going to

---

[11] The "release" that Mr. Schmidt sought would enable him to be released from Northern States' services and receive service from Clark Electric whose electric line is less than a half mile away.

an attorney." The district manager, however, asked Mr. Schmidt to "give him a few days," and the district manager said that he had a "new man on the block."

¶ 14. On September 15, 1993, two Northern States representatives came to the Schmidts' farm and conducted another stray voltage analysis. On this date, they found off-farm sources that caused voltage measurements to exceed the "level of concern" in the "cow contact" area. Northern States asserts that these results occurred because it tested under a hypothetical situation. It stated, "[t]o determine 'hypothetical' scenarios, [Northern States] temporarily bonded the Schmidts' grounding system to barn stanchion steel." In this temporary and hypothetical condition, the cow contact measurement did exceed 0.5[12] volt 60 Hz steady state for tests done in 1993, which was over the "level of concern" expressed in Northern States' tariff at that time. Northern States asserted, "[a]t no time did [Northern States] measure steady state contact voltage above the 'level of concern' expressed by the PSC[] . . . during normal farm operations." It appears Northern States and the Schmidts discussed installing an equipotential plane[13] sometime around this September 15, 1993, testing. Mr. Schmidt said, "after they tested it, they said they'd pay for [the equipotential plane] com-

---

[12] The 0.5 volt, AC, RMS, steady state across a 500–ohm resistor in the cow contact area is equivalent to the one-milliampere "level of concern" set by the PSC.

[13] "[A]n equipotential plane may reduce traditional stray voltage as measured by cow contact points." *Hoffmann,* 262 Wis. 2d 264, ¶ 4. Under § 8.0(d) of Northern States' tariff, Northern States should only act to reduce stray voltage, i.e., install equipment to reduce stray voltage, when stray voltage exceeds the "level of concern" under normal operating conditions.

pletely." Northern States asserts that it installed the equipotential plane, along with replacing some primary neutral conductor and improving some grounding, "to eliminate the possibility of exceeding the 'level of concern' had the farmer intentionally or inadvertently bonded his electrical grounding system to the barn stanchion steel."

¶ 15. On September 21, 1993, Mr. Schmidt signed a document entitled, "Stray Voltage Reduction Agreement," which listed "Equipotential Plane" under modifications. An invoice dated October 27, 1993, references the installation of an equipotential plane. After the equipotential plane installation, Northern States conducted another stray voltage analysis on November 2, 1993. The test found no off-farm sources causing more than one milliampere, the "level of concern," in the "cow contact" area. The herd showed improvements after Northern States installed the equipotential plane. However, the cows' health "gradually" began to decline again during the spring of 1994, and by 1997, the Schmidts' herd exhibited similar problems as before. From the fall of 1993 until 1997, the Schmidts had no contact with Northern States.

¶ 16. In 1997, Northern States contacted the Schmidts to inform them it was going to put a "new line in." Northern States increased the size of the neutral line, and the Schmidts described things as "bad went to worst." According to Mr. Schmidt, "[b]y [19]97, when they put that new line in. That — that's when it really went bad. Before that it was iffy. You know, there was times when I thought it was there but I didn't know what to do about it."

¶ 17. In December of 1998, the Schmidts were still having significant problems with their herd. Mr. Schmidt again contacted Northern States for additional

552

testing and began to inquire about an isolator.[14] On December 21 and December 30, 1998, Northern States tested and found no off-farm sources causing more than one milliampere, the "level of concern," in the "cow contact" area.

¶ 18. In January or February of 1999, Northern States installed the isolator. The Schmidts noticed a "[d]rastic improvement for a couple months," but in the spring of 1999, "[t]errible stuff" began to occur. Several cows, heifers, and calves died in the spring and summer of 1999.

¶ 19. In the spring of 2000, the Schmidts contacted Northern States to conduct stray voltage testing. On March 14, 2000, Northern States again tested and found no off-farm sources causing more than one milliampere, the "level of concern," in the "cow contact" area. Also, in the spring of 2000, the Schmidts' veterinarian, Dr. Jackson, evaluated their herd. He told the Schmidts, "get them out of the barn. Bring them in to milk them and put them outside the rest of the time. It's stray voltage." Mr. Schmidt told a Northern States representative about his veterinarian's opinion and recommendations. According to Mr. Schmidt, in response to the veterinarian's opinion, the Northern States' representative told Mr. Schmidt to "get a different vet."

¶ 20. In the summer of 2001, the Schmidts hired master electrician William Schmidt[15] to conduct stray voltage analysis. Unlike Van Ert, the record is clear that master electrician Schmidt had extensive experience

---

[14] Neutral isolation is a method of separating the primary and secondary neutrals. Separation attempts to prevent any off-farm sources of stray voltage from appearing in a "cow contact" area. PSC Docket 05–EI-115, at 15.

[15] The record contains no evidence that William Schmidt is related to Ralph and Karline Schmidt.

with stray voltage testing and analysis. Master electrician Schmidt began stray voltage work on dairy farms in 1985. Over time, he began to use more "elaborate recording" equipment for stray voltage testing, and by June of 2002, the majority of his time was devoted to stray voltage testing and analysis. Master electrician Schmidt generated a comprehensive five-page report for the Schmidts on November 3, 2001. He concluded, "the levels of stray voltage are substantial enough to create the symptoms seen in the Schmidt's dairy herd." He also concluded that the disconnected wire down the road could contribute to much higher levels of stray voltage during windy conditions, and the isolation provided by Northern States' isolator was inadequate. In addition, he concluded that the primary and secondary ground rods were much too close to each other, and the unit could have been leaking. In short, master electrician Schmidt recommended that Northern States convert the single-phase line providing electricity to the farm to a "Delta" or to a "Phase to Phase" operation.

¶ 21. On November 13, 2001, the Schmidts filed this lawsuit against Northern States. The initial complaint alleged claims of negligence, strict liability, nuisance, trespass, and violations of Wis. Stat. chs. 196 and 197, and the Wis. Admin. Code § PSC 114. An amended complaint, filed October 14, 2003, removed the claim of trespass.[16] Northern States denied the allegations and asserted several affirmative defenses. In addition, Northern States moved for summary judgment based upon the statute of limitations and the filed rate doctrine.

---

[16] The complaint initially included August and Joanne Heeg, the Schmidts' neighbors. However, the circuit court granted Northern States' motion to separate the Schmidts' and the Heegs' claims.

¶ 22. The circuit court granted summary judgment. It concluded that the applicable six-year statute of limitations barred the Schmidts' claims because the Schmidts discovered their injury and its cause in 1993. The circuit court reasoned that in 1993 a veterinarian[17] and electrician told the Schmidts they had a stray voltage problem due to Northern States. Moreover, the circuit court, relying on the deposition testimony of Mr. Schmidt, concluded that the Schmidts discovered their injury and its cause in 1993.[18] In addition, the circuit court concluded that regardless of the statute of limitations, the filed rate doctrine also barred the Schmidts' claims.

¶ 23. In an unpublished decision, the court of appeals reversed the circuit court on both issues. On the statute of limitations issue, it concluded that the facts do not support only one reasonable conclusion about when discovery occurred. The court of appeals reasoned that "[e]ven if it is reasonable to infer that the Schmidts knew or should have known prior to 1995 that stray voltage was present on their farm, that does not necessarily mean that they also should have known that Northern States was the cause of the problem," given Northern States' negative test results. With respect to the filed rate doctrine, the court of appeals reasoned that even though Northern States had filed a tariff,

---

[17] We find nothing in the record to support the assertion that a veterinarian told the Schmidts in 1993 that they had a stray voltage problem. However, a representative from Dairy Services did tell the Schmidts around this time that "you've got some current problems here" and "[y]ou should have somebody check this out."

[18] See footnote 24 for relevant portions of Mr. Schmidt's deposition testimony.

which described its policies and procedures for responding to customer complaints regarding stray voltage, the tariff does not allow the utility to circumvent *Hoffmann v. Wisconsin Electric Power Co.*, 2003 WI 64, 262 Wis. 2d 264, 664 N.W.2d 55.[19]

## II

¶ 24. Whether the circuit court properly granted summary judgment is a question of law that this court reviews de novo. *Green Spring Farms v. Kersten*, 136 Wis. 2d 304, 315, 401 N.W.2d 816 (1987). This court applies the same standards as those used by the circuit court. *Verdoljak v. Mosinee Paper Corp.*, 200 Wis. 2d 624, 630, 547 N.W.2d 602 (1996). These standards are set forth in Wis. Stat. § 802.08. Summary judgment is appropriate only where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Linville v. City of Janesville*, 184 Wis. 2d 705, 714, 516 N.W.2d 427 (1994). A factual issue is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. *Baxter v. Wisconsin Dep't of Natural Res.*, 165 Wis. 2d 298, 312, 477 N.W.2d 648 (Ct. App. 1991). A "material fact" is one that is "of consequence to the merits of the litigation." *In re Michael R.B.*, 175 Wis. 2d 713, 724, 499 N.W.2d 641 (1993). "Any reasonable doubt as to the existence of a genuine issue of material fact must be resolved against the moving party" for sum-

---

[19] In *Hoffmann*, the Wisconsin Supreme Court concluded that the absence of current above the PSC-established "level of concern" does not preclude a farmer from recovering damages from a utility for stray voltage injuries attributable to the utility. *See Hoffmann*, 262 Wis. 2d 264.

mary judgment. *Heck & Paetow Claim Serv., Inc. v. Heck*, 93 Wis. 2d 349, 356, 286 N.W.2d 831 (1980).

¶ 25. "The question of whether the filed rate doctrine shields the defendants from liability is a question of law." *Prentice v. Title Ins. Co. of Minn.*, 176 Wis. 2d 714, 721, 500 N.W.2d 658 (1993). This court decides questions of law independently of the circuit court and the court of appeals. *Id.*

### III

¶ 26. Northern States claims the Schmidts discovered their injury and its cause in 1993. Because the Schmidts filed their suit on November 13, 2001, Northern States asserts that the applicable six-year statute of limitations bars the Schmidts' claims. Northern States argues that Mr. Schmidt's own testimony demonstrates an objective belief that stray voltage from Northern States was injuring his herd in 1993. The Schmidts take issue with that assertion. We conclude that different reasonable inferences about when discovery occurred can be drawn from the undisputed facts in the summary judgment record. As a result, the circuit court erroneously determined as a matter of law that discovery occurred in 1993.

¶ 27. Section 893.52 of the Wisconsin Statutes prescribes a six-year statute of limitations for an action that arises out of an injury to property. Under Wis. Stat. § 893.52, a cause of action accrues when the plaintiff discovers, or with reasonable diligence should have discovered, the injury and that the defendant's conduct probably caused that injury. *Borello v. United States Oil*

557

*Co.*, 130 Wis. 2d 397, 411, 388 N.W.2d 140 (1986); *see also Hansen v. A.H. Robins Co., Inc.*, 113 Wis. 2d 550, 560, 335 N.W.2d 578 (1983). This court applies the discovery rule to "stray voltage cases." *See Kolpin v. Pioneer Power & Light Co., Inc.*, 162 Wis. 2d 1, 25, 469 N.W.2d 595 (1991). Discovery occurs when the plaintiff has information that would constitute the basis for an objective belief as to his or her injury and its cause. *Claypool v. Levin*, 209 Wis. 2d 284, 300, 562 N.W.2d 584 (1997); *see also Kolpin*, 162 Wis. 2d at 20–21.

¶ 28. However, a plaintiff's subjective or unsubstantiated lay belief does not constitute discovery. *Claypool*, 209 Wis. 2d at 300. Even if the plaintiff knew of his or her injury and had a "suspicion or a hunch" as to its cause, discovery does not occur until the plaintiff has an objective basis regardless of whether her hunch later proves to be correct. *Borello*, 130 Wis. 2d at 414. Where the cause and effect relationship is not readily apparent, a layperson's subjective belief of the cause is not sufficient to start the statute of limitations running. *Id.* at 412.

¶ 29. This court had the opportunity to examine and apply the discovery rule in the context of summary judgment in *Claypool* and *Clark*.[20] Before this court can conclude as a matter of law when discovery has occurred, it must determine whether reasonable inferences with regard to when discovery occurred can be drawn from the undisputed facts in the record. *See Cameron v. City of Milwaukee*, 102 Wis. 2d 448, 459, 307 N.W.2d 164 (1981). If conflicting results can be reached, summary judgment is not appropriate. *Id.*

[20] *Clark v. Erdmann*, 161 Wis. 2d 428, 468 N.W.2d 18 (1991).

¶ 30. In *Clark*, Dr. Erdmann performed corrective surgery on Ruby Clark's right foot in August of 1981. *Clark*, 161 Wis. 2d at 433. Clark began to have post-operative problems with her right foot, and as a result, she consulted a number of other doctors, including Doctors Davey and Kurland, between April 1982 and April 1985. *Id.* at 434–35. In September of 1985, a team, from the same clinic as Dr. Erdmann, performed surgery to correct Clark's right foot. *Id.* at 435. Clark knew this surgery was to correct Dr. Erdmann's failed surgery; she stated that after she spoke to Doctors Davey and Kurland in 1984 and April of 1985, she realized her foot was in bad shape and that it was Dr. Erdmann's fault. *Id.* Clark filed suit in February 1987. This court concluded that, as a matter of law, Clark had an objective belief in 1985 as to her injury and its cause. *Id.* at 449. The court reasoned that Clark obtained verification from Doctors Davey and Kurland that her first surgery was unsuccessful. The court stated, "[t]here being no factual disputes or competing inferences to be drawn," summary judgment was appropriate. *Id.* at 448–49.

¶ 31. In *Claypool*, the plaintiff was urgently admitted to the hospital because she suffered from a number of symptoms, which included problems with her vision. *Claypool*, 209 Wis. 2d at 287. Between March and April of 1989, Dr. Levin treated Claypool's eyes; however, she was permanently blind by March 8, 1989. *Id.* at 287–88. On April 10, 1989, four days after her release from the hospital, Claypool retained counsel, but after much delay, he concluded that no suit could be filed. *Id.* at 288. In 1993, another lawyer determined that a viable medical malpractice claim existed. *Id.* Claypool commenced her lawsuit well beyond the three-year statute of limitations. *Id.* at 289–91. This court concluded that summary judgment was appropriate because Mrs. Claypool discovered

or should have discovered her injury between March and April of 1989.[21] *Id.* at 291–302. The court found that Claypool entered the hospital with vision problems, was treated by Dr. Levin for approximately one month, left the hospital permanently blind, and retained counsel shortly after she left the hospital. *Id.* at 302. Based upon those facts, and despite receiving incorrect legal advice, this court concluded that Mrs. Claypool had an objective basis as to her injury and its cause in March or early April of 1989. *Id.* at 303.

¶ 32. In both *Clark* and *Claypool*, this court determined that the statute of limitations barred the plaintiff's claims. The undisputed facts led to but one reasonable inference about when discovery occurred. As a result, summary judgment was appropriate.

¶ 33. This court applied the discovery rule to a "stray voltage" case in *Kolpin*.[22] Even though the jury concluded that discovery occurred or should have occurred prior to February 17, 1981, this court concluded, as a matter of law, that discovery did not occur prior to February 17, 1981. Much like the Schmidts, the Kolpins began to notice strange behavior in their cattle, such as cows refusing to eat, lapping at their "waterers," producing less milk, and experiencing an increased incidence of mastitis. The Kolpins called their veterinarian who suggested they contact some experts, but neither

---

[21] The circuit court concluded, "the undisputed facts can lead to but one reasonable inference, that is, in the exercise of reasonable diligence plaintiffs should have discovered the probable cause of the injury within a reasonably short period of time after the injury." *Claypool v. Levin,* 209 Wis. 2d 284, 289, 562 N.W.2d 584 (1997).

[22] *Kolpin v. Pioneer Power & Light Co., Inc.,* 162 Wis. 2d 1, 469 N.W.2d 595 (1991).

the equipment expert nor the state veterinarian could find any equipment problems. *Kolpin*, 162 Wis. 2d at 11–12.

¶ 34. Mr. Kolpin bought a voltmeter around 1980 because of some articles he read on stray voltage. *Id.* at 12. After discovering very high voltage readings in his milking parlor, Kolpin called an electrician in 1980 to investigate, but the electrician did not know what they meant and suggested that Kolpin call the electric company. *Id.* A representative from the electric company came to the Kolpin farm, but he did not know how or where to measure for stray voltage. *Id.* The PSC also sent a representative to the farm. While he did suggest changes to electrical motors and circuitry, which the Kolpins implemented, he did not indicate whether they had a stray voltage problem. *Id.* at 12–13.

¶ 35. In the spring of 1980, the electric company changed its distribution system by "driving in twenty additional grounding rods on the distribution line that served the farm." *Id.* at 13. While the voltage levels in the barn dropped significantly, the cows' behavior and milk production did not change. *Id.* In September of 1983, the Kolpins hired an electrical contractor with a background in "stray voltage." *Id.* at 13–14. The Kolpins installed an electronic grounding device in November of 1983. *Id.* at 14. Following the installation of the grounding system, milk production quickly bottomed out but then increased to a level equivalent to before the problems arose, and the cows' behavior returned to normal. *Id.* Kolpin testified, "we weren't sure it was stray voltage or what it was until 1983, when the grounding system was installed and the voltage levels dropped to their lowest level." *Id.* On January 16, 1986, the Kolpins wrote a letter to the manufacturer of the grounding system: "We are very pleased with the results

of your electronic grounding system in reducing the stray voltage caused by our power company's inability to effectively ground their primary neutral system." *Id.*

¶ 36. The Kolpins filed suit on February 17, 1987, on theories of negligence, strict liability, and nuisance. *Id.* The jury affirmatively found that the Kolpins knew or should have known, with the exercise of reasonable care, prior to February 17, 1981, that Pioneer's electrical distribution system was a cause of damage to their dairy operation. *Id.* at 15. This court concluded as a matter of law that the jury should have answered "no" to this question instead of "yes." *Id.* at 27. The court reasoned that while the Kolpins were "aware of the concept of stray voltage" by 1980 and had a hunch that stray voltage was their problem, they could not tell whether it was attributable to Pioneer. *Id.* at 26. The court concluded, "[o]nce the problem was remedied, the Kolpins objectively knew that Pioneer's distribution system" was the cause of their problem. *Id.* "[T]he Kolpins did not discover, or with the exercise of reasonable care should not have discovered, prior to February 17, 1981, that Pioneer's electrical distribution system was a cause of damage to their dairy operation." *Id.* at 27.

¶ 37. Unlike in *Clark* and *Claypool*, in the present case the undisputed facts lead to more than one reasonable inference about when discovery occurred. In *Kolpin*, the plaintiff obtained verification[23] that his hunch was correct, and only one reasonable inference existed about whether discovery indeed occurred in November of 1983. In this case, however, competing

---

[23] This should not be construed to mean that an expert is required for verification. *See Fritz v. McGrath,* 146 Wis. 2d 681, 690, 431 N.W.2d 751 (Ct. App. 1988) (concluding that an expert opinion is not a prerequisite to discovery). Verification may occur in many forms.

inferences exist as to whether discovery occurred in 1993. Reasonable inferences drawn from the undisputed facts in the record could lead a finder of fact to conclude that discovery occurred in 1993 or the factfinder could come to a different conclusion. Therefore, summary judgment is not appropriate in this case.

¶ 38. Northern States reasonably argues that the Schmidts had an objective basis as to their injury and its cause in 1993. It relies on the following facts: In 1993, the Schmidts' dairy consultant urged them to call an electrician because he thought they had "some voltage problems." The Schmidts contacted a private electrician to conduct stray voltage testing. Van Ert concluded that the Schmidts had a stray voltage problem and thought the problem was from Northern States. He suggested a larger transformer and stated "problems started when neutral fell to [the] ground in Sept. of 1992." Northern States asserts, "Mr. Schmidt's deposition testimony makes clear that he knew or should have known that his injury existed as early as 1992 and that he was 'certain' he knew the cause of the injury."[24]

---

[24] In response to deposition questioning, Mr. Schmidt testified as follows:

Q: Okay. From your study of some of the materials back in '93, you were aware that stray voltage could be a problem, true?

A: True.

Q: You were confident in '93 that stray voltage was a problem for you, true?

A: Yes.

Q: You were confident that [it] was coming from NSP, true?

A: Yes, I guess.

. . . .

Q: Do you now know why the cows started to get sick in 1992?

¶ 39. One reasonable inference drawn from these facts is that the Schmidts did indeed discover their injury and its cause in 1993. However, another reasonable inference drawn from these facts is that the Schmidts were speculating they had a stray voltage problem in 1993 and only had a hunch as to its cause. In addition to Mr. Schmidt's deposition testimony cited by Northern States, Mr. Schmidt also testified that "[b]y [19]97, when they put that new line in. That — that's when it really went bad. Before that it was iffy. You know, there was times when I thought it was there but I didn't know what to do about it." When we consider Mr. Schmidt's equivocal statements in the context of all the facts and circumstances, we conclude that the undisputed facts lead to more than one reasonable inference about when discovery occurred.

¶ 40. Consider other relevant facts that also occurred in 1992 and 1993: At the Schmidts' request, Northern States conducted stray voltage testing in November of 1992 and concluded that the Schmidts had no stray voltage problem and they "would never have

A: I think the electric—the problems with the electricity just gradually kept getting worst [sic].

Q: And approximately when did you become certain that it was the problems with the electricity that caused the decline of the cows in 1992 and not something else?

A: In '93, when Brian Vanert come out there. There was all kinds of voltage.

. . . .

Q: In 1993, were you confident that stray voltage was the cause of all the problems with the cows?

 Mr: Koby: Object to form and foundation. Go ahead.

A: You can never be a hundred percent confident of anything, but in 1993 I knew there was a voltage problem.

this problem because [the Schmidts] have plastic water lines." In the spring of 1993, Van Ert rewired the internal system on the farm, but not the external Northern States system. He concluded that the Schmidts had a stray voltage problem and suggested that it was from Northern States. Van Ert's qualifications, however, are not present in the summary judgment record. Thereafter, in July 1993, Northern States conducted more testing and again concluded that no off-farm sources were causing a stray voltage problem. In August 1993, Northern States did some "grounding work" nearby and wanted to do more testing when that was completed to see if the "effort had any positive effects." Between August 30, 1993, and September 15, 1993, the Schmidts contacted Northern States and told them they wished to discontinue Northern States' service, and they were going to contact an attorney. Northern States responded by asking for time and telling the Schmidts that Northern States had a "new man on the block." In late 1993, Northern States installed an equipotential plane but claimed it was a precautionary installation and not installed to reduce stray voltage levels below the "level of concern."[25] When considering

---

[25] The installation of the equipotential plane produces a competing inference: Northern States claims it can only provide stray voltage reduction if stray voltage exceeds the "level of concern." However, an equipotential plane is a device used to reduce stray voltage. Its installation likely violates the tariff because Northern States claims it never recorded measurements that exceed the "level of concern" during normal operating conditions. Thus, one may conclude that stray voltage did exceed the "level of concern" if Northern States installed an equipotential plane. However, Northern States claims that it only installed the equipotential plane as a precautionary measure. Competing inferences arise.

all of the facts and circumstances in 1992 and 1993, reasonable persons could conclude that discovery did or did not occur in 1993.

¶ 41. A competing argument to Northern States' assertion that discovery occurred in 1993 is that every time the Schmidts moved closer to discovering their injury and its cause, Northern States conducted testing and found no stray voltage problem. Northern States' repeated testing and conclusions that no stray voltage problem existed may have affected the Schmidts' opportunity to discover their injury and its cause. Whether Northern States' test results affected the reasonable diligence of the Schmidts, and hence discovery, is for the jury to consider.[26] Contemporaneous with Van Ert's findings in 1993, Northern States concluded that no stray voltage problem existed, and they continued to assert this over the years.[27] Northern States' continued denial, through negative test results, may have bearing on the issue of discovery. *See Jacobs v. Nor-Lake, Inc.*, 217 Wis. 2d 625, 637, 579 N.W.2d 254 (Ct. App. 1998) (finding that an official denial by a possible defendant company may contribute to competing inferences that a jury must resolve).

¶ 42. Competing inferences as to when discovery occurred continued well past 1993. By 1997, the

---

[26] This should not be construed that the court is establishing a bright line rule that if a potential tortfeasor denies a role in the injury and its cause, then discovery can never occur. Discovery can still occur even if the potential tortfeasor denies the injury and its cause.

[27] In fact, Northern States seemingly continues to assert that no stray voltage problem existed, but it continues to assert that the Schmidts discovered or should have discovered their injury in 1993. These conflicting assertions are difficult to resolve at summary judgment.

Schmidts' herd was experiencing the same problems as before, even after Northern States installed a new line. Northern States conducted more stray voltage testing in 1998 and again found no stray voltage exceeding the "level of concern." In 1999, Northern States installed an isolator, but the herd's health drastically declined after just a couple of months of improvement. Northern States conducted another stray voltage test in 2000, but it found no stray voltage exceeding the "level of concern." On the other hand, a veterinarian and master electrician concluded in the spring of 2000 and summer of 2001 that the Schmidts had a stray voltage problem. Moreover, the master electrician concluded that the problem was attributable to Northern States.[28]

¶ 43. The undisputed facts in this case lead to more than one reasonable inference about when discovery occurred. On the one hand, Van Ert's conclusions and Mr. Schmidt's deposition testimony could lead a fact-finder to conclude that discovery occurred in 1993. On the other hand, Mr. Schmidt's additional, equivocal statements about discovery, Northern States' repeated negative test results, the Schmidts other efforts to eliminate possible causes, and the improvement of the herd's health after installing the equipotential plane followed by a decline in the herd's health could lead a fact-finder to conclude that discovery did not occur in 1993.

¶ 44. Northern States further argues that "the Court of Appeals has . . . threaten[ed] to extinguish . . .

---

[28] While the record contains evidence that discovery occurred in 2001 when master electrician Schmidt made his findings, we make no determination today as to when the Schmidts discovered their injury and its cause. Likewise, we cannot determine as a matter of law whether discovery occurred at an earlier time, which would render the possible 2001 "discovery" moot.

[Northern States] substantive, constitutionally based right to dismissal on statute of limitations grounds" because it allows the Schmidts to "undiscover" their injury and its cause. In *Claypool*, we corrected the court of appeals' conclusion that " 'discovery' as a matter of law was not necessarily locked in time by [plaintiff's] initial belief given the subsequent events." *Claypool*, 209 Wis. 2d at 301. Based upon the plain meaning of the statute,[29] we concluded that an injury and its cause cannot be undiscovered. *Id.* at 302. In other words, once a person has what would be viewed as an objective belief as to his or her injury and its cause, that person is not entitled to cast aside that belief because of subsequent events. Northern States asserts that the "Schmidts and their expert, Mr. Van Ert, believed in 1993, and continue to believe today, that stray voltage was causing Plaintiffs' injury." Northern States argues that "[n]o subsequent events or statements by [Northern States], even if they were believed by [the] Schmidts (and the record is clear that they were not) can eliminate that discovery."

¶ 45. Our decision today does not limit or call into question *Claypool*. To "undiscover" the injury means discovery must have occurred in the first instance. In

---

[29] Wisconsin Stat. § 893.55(1) (1993–94) provides:

· (1) Except as provided by subs. (2) and (3), an action to recover damages for injury arising from any treatment or operation performed by, or from any omission by, a person who is a health care provider, regardless of the theory on which the action is based, shall be commenced within the later of:

(a) Three years from the date of the injury, or

(b) One year from the date the injury was discovered or, in the exercise of reasonable diligence should have been discovered, except that an action may not be commenced under this paragraph more than 5 years from the date of the act or omission.

this case, we cannot determine as a matter of law when discovery occurred because more than one reasonable inference about when discovery occurred can be drawn from the summary judgment record. Moreover, Northern States can still argue to the trier of fact that the Schmidts were not reasonably diligent and that the Schmidts discovered their injury and its cause in 1993.

¶ 46. Northern States also claims that the court of appeals' holding conflicts with the *Claypool* conclusion that discovery may occur even if more than one reasonable cause of the injury exists. We stated in *Claypool*:

> This court stated in *Clark* that discovery occurs when the 'plaintiff has information that would constitute the basis for an objective belief of her injury and its cause. . . .' *Id.* . . . *This does not mean that if there is more than one reasonable cause of the injury that discovery cannot occur. . . .*

*Claypool*, 209 Wis. 2d at 300. (Emphasis added.)

¶ 47. While the above statement is true, the criteria for summary judgment likewise exist. The rule of law remains that if more than one reasonable inference can be drawn from the undisputed facts, summary judgment is not appropriate. *Cameron*, 102 Wis. 2d at 459–60. This court ended the *Clark* decision with the following: "There being no factual disputes or competing inferences to be drawn . . . summary judgment was appropriate . . . ." *Clark*, 161 Wis. 2d at 449.

¶ 48. Lastly, Northern States claims that the court of appeals' decision creates a rule that "discovery can only occur subsequent to correction of the injury." However, we conclude that discovery may occur before the problem is corrected. A discovery determination

569

may be less complex in cases where the injury and its cause are readily apparent. For example, little time is often required to determine the injury and its cause in a car accident. In many instances, a plaintiff almost instantly knows of their injury and its cause.

¶ 49. In a stray voltage case, such as the one now before the court, a person's discovery of the injury and its cause may not immediately arise. *See Kolpin*, 162 Wis. 2d at 26 (finding that stray voltage does not involve a typical tort claim, such as an auto accident, where both the cause and effect are readily apparent). "Because of the difficulties in pinpointing the exact source of stray voltage, it is difficult for a plaintiff to determine the relationship between the stray voltage and its source. The source could be the plaintiff's own electrical wiring, a defect in the milking parlor, or an improperly grounded line leading to the barn." *Id*. at 26–27.

¶ 50. In some stray voltage cases, the plaintiff may have to undergo a process of elimination before he or she can discover the injury and its cause.[30] This, of course, does not mean that a process of elimination is required in every stray voltage case or that a stray voltage remedy must occur before a farmer can discover it.

---

[30] This process of elimination may or may not include attempts at reducing stray voltage by installing equipment for stray voltage reduction, testing by the utility, testing by a private expert, veterinarian and nutrition services, or findings by other persons knowledgeable about stray voltage. We do not suggest that an individual, in a stray voltage case, cannot form an objective basis as to the injury and its cause on his own. We merely suggest that when the injury and cause are not readily apparent, such as in stray voltage cases, a discovery determination at summary judgment is more difficult. However, as information and technology with regard to stray voltage evolves, this may change.

¶ 51. Because here, competing reasonable infer-
ences can be drawn from the undisputed facts, sum-
mary judgment is not proper.

IV

■■■■

¶ 52. This court must now determine whether the
filed rate doctrine precludes the plaintiffs' common-law
tort claims as a matter of law. We conclude that the filed
rate doctrine does not bar the plaintiffs' claims because
(1) the Schmidts do not seek a "privilege" within the
meaning of the filed rate doctrine and (2) as stated in
*Hoffmann*, conformance with the Public Service Com-
mission of Wisconsin's (PSC) findings does not abolish
Northern States' common-law duty of ordinary care.

¶ 53. Northern States is required, by statute, to
file a tariff that specifies the rate at which service will
be provided, and the utility's rules and regulations that
may affect that rate and service. *See* Wis. Stat.
§ 196.19(1) and (2). Once Northern States places a
tariff on file, it must give effect to the tariff under the
filed rate doctrine and cannot provide services other
than those in accordance with the tariff.[31]

---

[31] Section 196.22 of the Wisconsin Statutes represents a
"statutory expression of the filed rate doctrine." *GTE North Inc.
v. Public Serv. Comm'n of Wis.*, 176 Wis. 2d 559, 569, 500 N.W.2d
284 (1993). Wisconsin. Stat. § 196.22 provides:

> No public utility may charge, demand, collect or receive more
> or less compensation for any service performed by it within the
> state, or for any service in connection therewith, than is specified
> in the schedules for the service filed under s. 196.19, including
> schedules of joint rates, as may at the time be in force, or demand,
> collect or receive any rate, toll or charge not specified in the
> schedule.

¶ 54. Northern States' tariff contains the following relevant provisions in Section 8.0 entitled "Stray Voltage Program" with a subheading entitled "Stray Voltage Tariff":

> (a) Under normal operating conditions, a neutral-to-earth current of voltage may exist on the grounded or grounding conductors or other conductive objects on the customer's premises. The source of the current or voltage may be located on the premises, off the premises, or a combination of both. Upon the customer's request, the Company will investigate inquiries associated with neutral-to-earth current or voltage concerns.

> (b) Stray voltage is a 60 Hz steady state AC RMS voltage that can be measured across a 500–ohm shunt resistor that has been connected between two points which livestock may contact simultaneously. . . .

> . . . .

> (d) Following a determination by the Company that, under normal operating conditions, the contributions to animal contact current from off-farm sources is in excess of 1.0mA, the Company shall implement, at its expense, measures to reduce this contribution to below 1.0mA. . . .

¶ 55. Northern States argues, under § 8.0(a), that "stray voltage may be present on a customer's system as a matter of course." Northern States further argues, under § 8.0(d), that its filed tariff "gives rise to an affirmative obligation of [Northern States], if—and only if—the stray voltage exceeds" one milliampere in the "cow contact" area due to off-farm sources. As a result, Northern States asserts that it cannot be liable unless evidence shows a measurement greater than one milliampere, the "level of concern," because it would violate the filed rate doctrine for Northern States to

provide this "service" when it is not required to do so under its tariff. Northern States argues that if it provided stray voltage reduction when stray voltage levels were below the "level of concern," it would be giving the Schmidts more "services" then their rate includes. We disagree and conclude that the terms of the tariff do not alter Northern States' common-law duty of ordinary care.

¶ 56. The purpose of the filed rate doctrine is to avoid discriminatory rates and judicial rate-making. *Servais v. Kraft Foods, Inc.*, 2001 WI App 165, ¶ 12, 246 Wis. 2d 920, 631 N.W.2d 629. This court has applied the filed rate doctrine in a number of different contexts since 1911. *See Prentice*, 176 Wis. 2d at 723 (summarizing the application of the filed rate doctrine in Wisconsin). The filed rate doctrine seeks to enforce the rates and services provided for those rates so that all customers are treated uniformly and according to the published tariff. *American Tel. & Tel. Co. v. Central Office Tel., Inc.*, 524 U.S. 214, 223 (1998) (AT&T). It aims to prevent a company from intentionally misquoting services as a means to hide discounts. *Id.* "[T]he filed rate doctrine prohibits a plaintiff from claiming a lower rate than the one filed by a regulated entity with the appropriate regulatory agency because the filed rate alone governs the relationship between the parties." *Prentice*, 176 Wis. 2d at 721. Rates, however, do not exist in isolation; rather, rates have meaning only when one knows the services to which the specific rates are attached.[32] *AT&T*, 524 U.S. at 223. "Discriminatory

___

[32] This court approves of the conclusion in *AT&T* that the filed rate doctrine applies to more than just rates. *American Tel. & Tel. Co. v. Central Office Tel., Inc.*, 524 U.S. 214, 223–24

'privileges' come in many guises, and are not limited to discounted rates." *Id*. at 224.

¶ 57. In *AT&T*, the United States Supreme Court concluded that the filed rate doctrine barred Central Office's state-law claims because Central Office sought privileges, i.e., services, not in the tariff. *AT&T*, 524 U.S. at 226. Central Office brought suit against AT&T for breach of contract and tortious interference with contractual relations. *Id*. at 216. Central Office claimed that AT&T "promised various service, provisioning, and billing options in addition to those set forth in the tariff," and Central Office sought those extra services even though it previously agreed that services would be governed by AT&T tariffs. *Id*. at 219–20.

¶ 58. The Court concluded that faster, guaranteed provisioning of orders at the price of the published rate was "certainly a privilege within the meaning" of the filed rate doctrine. *Id*. at 225. Central Office sought to enforce a promise that AT&T would provision orders within 30 to 90 days. *Id*. However, the published tariff left it to AT&T to establish and confirm a due date for provisioning. *Id*. Because the special provisioning would have given Central Office an extra service or privilege not included in the tariff and not offered to all customers, the Court concluded that the filed rate doctrine barred the plaintiff's claims. *Id*. at 226.

---

(1998) (AT&T). In *AT&T*, the Court determined that if it applied the filed rate doctrine only to rates, it might not prevent advantages given in the form of more services for the same dollar. Discrimination in charges must include non-price features, or a party could defeat the purpose of the doctrine. *Id*. at 223. "An unreasonable 'discrimination in charges' . . . can come in the form of a lower price for an equivalent service or in the form of an enhanced service for an equivalent price." *Id*.

¶ 59. Unlike the plaintiff in *AT&T*, the Schmidts do not seek a "privilege" within the meaning of the filed rate doctrine.[33] Central Office sought the benefit of time-constrained provisioning, which was as an added "perk" not available to other customers, whereas the Schmidts seek a common-law duty of ordinary care.[34] The duty of ordinary care is not a "privilege" or "service" that Northern States bestows upon the Schmidts or any of its customers. Northern States' tariff cannot undermine that common-law responsibility.

¶ 60. Northern States claims that stray voltage reduction is a service—or "privilege"—that it uniformly provides to customers who have stray voltage that exceeds the "level of concern." Northern States argues that it cannot be liable unless evidence shows a measurement greater than the "level of concern," because it would violate the filed rate doctrine for Northern States to provide this "service" when it is not required to do so under its tariff. By accepting Northern States' creative legal argument, we would expand the filed rate doctrine well beyond its original purpose of ensuring non-discriminatory rates and services.

---

[33] *Cf. Schmidt* with *Chicago & Alton A.R. Co. v. Kirby*, 225 U.S. 155, 163 (1912) (concluding that the filed rate doctrine barred the plaintiff's claim because the published tariff did not provide for expedient shipping, and therefore, the shipper received an undue advantage over others); *Cahnmann v. Sprint Corp.*, 133 F.3d 484, 487, 490–91 (7th Cir. 1998) (the plaintiff's claims were barred because the plaintiff sought favorable services—more free calls—under the original tariff instead of less favorable services under the amended tariff).

[34] A common-law duty of ordinary care may or may not be consistent with the terms of a tariff. These are considerations for a fact-finder.

¶ 61. Traditionally, the filed rate doctrine precluded a utility from giving extra-tariff benefits to one customer and not offering the same benefits to another. Stray voltage, however, is not a benefit that the Schmidts or any other customers desire to receive. If Northern States is responsible for the Schmidts' stray voltage, it cannot claim that reducing stray voltage is a "service" or "privilege" that it provides. No authority exists for extending the doctrine to circumstances where a defendant is allegedly responsible for harming the plaintiff, e.g., providing stray voltage, but then claims that eliminating the harm is a "service" or "privilege" within the meaning of the doctrine. Because the Schmidts do not seek a privilege within the meaning of the filed rate doctrine, it does not bar the Schmidts' claims.

¶ 62. Northern States asserts that a plaintiff may not expand a utility's liability through an action in contract or tort for matters specified in a filed tariff.[35] Northern States argues that if the Schmidts are successful in their action, Northern States' liability will be expanded through tort. However, the filed rate doctrine precludes contract claims for additional and better services and contract claims disguised as tort claims. In *AT&T*, the Court dismissed the breach of contract claim and the tortious interference with contractual relations claim. As to the tort claim, the Court concluded that its "analysis applies with equal force ... because that [tort claim] is wholly derivative of the contract claim for additional and better services." *Id.* at

---

[35] Northern States cites to *Keogh* for the proposition that the "rights as defined by the tariff cannot be varied or enlarged by either contract or tort of the carrier." *Keogh v. Chicago & N.W. Ry. Co.*, 260 U.S. 156, 163 (1922).

226. Central Office "can no more obtain unlawful preferences under the cloak of a tort claim than it can by contract." *Id.* at 227.

¶ 63. Chief Justice Rehnquist elaborated on this point in his concurrence and stated that "[t]he acts of tortious interference asserted against AT&T amount to no more than an intentional refusal to provide services to [Central Office] in an amount or manner contrary to the filed tariff." *Id.* at 228–29. This finding, the Chief Justice wrote, was "necessary to the conclusion that [Central Office's] state-law tort claim" could not proceed. *Id.* The Chief Justice reasoned that the filed rate doctrine disallows suits that are brought in order to enforce an agreement to provide services on terms that are different from those terms listed in the tariff. *Id.* Chief Justice Rehnquist further wrote:

> The tariff does not govern, however, the entirety of the relationship between the common carrier and its customers. . . . The filed rate doctrine's purpose is to ensure that the filed rates are the exclusive source of the terms and conditions by which the common carrier provides to its customers the services covered by the tariff. It does not serve as a shield against all actions based in state law.

*Id.* at 230–31 (Rehnquist, C.J., concurring).

¶ 64. The bar on certain suits prevents plaintiffs from obtaining rates or services through instituting a lawsuit based on contract or contract-derived tort claims, such as tortious interference with contractual relations or breach of contract "disguised" as fraud. It seeks to preclude a party from attempting to enforce an agreement, contrary to the filed rate, under the cloak of a tort claim. Because the Schmidts are not seeking extra "services" or "privileges" through contract claims or tort claims that are "wholly derivative" of contract

577

claims, the Schmidts' common-law tort claims are not barred by the filed rate doctrine.

¶ 65. The precedent established by *Hoffmann* supports our conclusion that Northern States may not supplant its common-law duties in tort through its tariff and the filed rate doctrine. This court concluded in *Hoffmann* that a defendant might still be liable even if there are no "cow contact" measurements of more than one milliampere, the "level of concern." *Hoffmann*, 262 Wis. 2d 264, ¶ 13. In other words, we concluded that a utility's common-law duty of ordinary care is not tied to the PSC's findings.[36]

¶ 66. Wisconsin Stat. § 196.857 establishes the stray voltage program.[37] In *Hoffmann*, this court stated, "it is a 'well-established rule that the enactment of safety statutes or legislation giving a commission jurisdiction over a certain activity does not abolish the duty arising under common-law negligence.' " *Id.*, ¶ 12 (citing *Kemp v. Wisconsin Elec. Power Co.*, 44 Wis. 2d 571, 579, 172 N.W.2d 161 (1969)). " 'A safety statute merely establishes a minimum standard of care and the

---

[36] The PSC findings establish a "level of concern," but the commission stated, it "will stay apprised of the on-going research and will raise or lower this standard as appropriate." PSC Docket 05–EI–115, at 1–2.

[37] Wisconsin Stat. § 196.857, Stray voltage program, provides in part:

(1g) Program elements. (a) The commission shall establish and administer a stray voltage program. The program shall focus on regulation, education, inspection and investigation relating to stray voltage.

(b) The commission shall identify standardized test procedures check lists and equipment to be used by public utilities to investigate stray voltage. The commission may audit the results of investigations.

conduct, even though sanctioned or in conformity with the statute, is not thereby necessarily relieved of conforming to the common-law requirements of ordinary care.' " *Id.* (citing *Blanchard v. Terpstra*, 37 Wis. 2d 292, 299, 155 N.W.2d 156 (1967)).

¶ 67. This court further stated that statutes in derogation of the common law are to be strictly construed. *Fuchsgruber v. Custom Accessories, Inc.*, 2001 WI 81, ¶ 25, 244 Wis. 2d 758, 628 N.W.2d 833. "A statute does not change the common law unless the legislative purpose to do so is clearly expressed in the language of the statute." *Id.* "To accomplish a change in the common law, the language of the statute must be clear, unambiguous, and peremptory." We concluded that no language in chapter 196 of the Wisconsin Statutes changes common-law negligence with respect to stray voltage.[38] *Hoffmann*, 262 Wis. 2d 264, ¶ 13. Therefore, Northern States cannot rely on § 8.0(d) of its tariff to claim that it cannot be liable unless stray voltage exceeds the "level of concern." Northern States cannot circumvent *Hoffmann* by inserting PSC findings —the very findings that we decided in *Hoffmann* do not

---

[38] Changing the common law with respect to stray voltage was specifically contemplated and rejected in Wisconsin.

In Wisconsin's initial budget bill for 2001–2002, a provision was included that would have changed the standards for civil liability with respect to stray voltage. The bill proposed creating a statute, providing that '[a] public utility is immune from liability for any damage caused by or resulting from stray voltage contributed by the public utility if that stray voltage is below the level of concern established by the public service commission . . . .' 2001 S.B. 55, § 3866. However, after severe public criticism, the provision was withdrawn and was never passed into law.

*Hoffmann*, 262 Wis. 2d 264, ¶ 13.

limit liability—into its tariff and subsequently claim the filed rate doctrine bars liability. The precedent set in *Hoffmann,* which established that PSC's standards do not alter the common law, remains good law. Common-law tort liability was not eliminated when Northern States inserted the PSC findings into its tariff.

¶ 68. Moreover, Northern States' tariff contains no limitation on liability with respect to stray voltage. Rather, Northern States' tariff contains a limitation on liability for the regular use of electricity. Stray voltage does not fall under the regular supply of electricity; it does not pass through the meter. Northern States cites to Section 4.6 of its tariff to show, generally, that the tariff does contain limitations on liability. Section 4.6 reads:

> Continuity of service. The Company will use all reasonable care to provide continuous service but does not assume responsibility for a regular and uninterrupted supply of electric service and shall not be liable for any loss, injury, or damage resulting from the use of service, or arising from or caused by the interruption or curtailment of the same.

This provision limits the defendant's liability for the plaintiffs' regular use of electricity. However, no such limitation on liability exists with respect to stray voltage.

## V

¶ 69. Accordingly, we remand to the circuit court. We conclude that more than one reasonable inference may be drawn from the undisputed facts in the summary judgment record about when discovery occurred. Therefore, summary judgment is not proper. We further

conclude that the filed rate doctrine does not bar the plaintiffs' claims because (1) the Schmidts do not seek a "privilege" within the meaning of the filed rate doctrine, and (2) as stated in *Hoffmann*, conformance with the PSC's findings does not abolish Northern States' common-law duty of ordinary care.

*By the Court.*—The decision of the court of appeals is affirmed.